## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action |
| v. | No. 2:08-cr-00139-AB-1 |
| MARTIN MUELLER | |

July __7th___, 2020                                            **Anita B. Brody, J.**

### MEMORANDUM

At this point, the global crisis the COVID-19 pandemic has caused hardly needs to be detailed.  We are all living with its effects.  There are over 11 million confirmed cases of COVID-19 worldwide, and over 2.8 million confirmed cases in the United States.[1]  Half a million people have died from the disease, including almost 130,000 people in the United States.[2]  At this point, there is no approved cure, treatment, or vaccine to prevent it.[3]  People with pre-existing medical conditions—like petitioner Martin Mueller—face a particularly high risk of dying or suffering severe health effects should they contract the disease.

Mr. Mueller is 64 years old and has only one functioning lung.  Ninety percent of his left lung has been surgically removed.  According to his Presentence Investigation Report ("PSR"), he "at times has a difficult time breathing during allergy season, while exercising, or if he has a cold."  PSR ¶ 89.  He also suffers from hypertension and a number of other medical conditions.

---

[1] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, Johns Hopkins University of Medicine Coronavirus Resource Center (accessed July 6, 2020), https://coronavirus.jhu.edu/map.html.

[2] *Id.*

[3] *See Coronavirus disease 2019 (COVID-19)*, Mayo Clinic (accessed July 1, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/diagnosis-treatment/drc-20479976.

Mr. Mueller is an inmate at FCI-Allenwood Low, a low-security prison.  He was sentenced to 202 months' incarceration for being a felon in possession of a firearm and for heroin possession.  Mr. Mueller has served over twelve years of his sentence and is two years away from his current projected release date.  He moves for a reduction of his prison sentence and immediate release under the "compassionate release" statute, 18 U.S.C. § 3582(c)(1)(A).  He argues that "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. §3582(c)(1)(A)(i).

For Mr. Mueller, nothing could be more extraordinary and compelling than this pandemic.  COVID-19 is a respiratory disease.  Mr. Mueller lives with only one lung and has a history of smoking.  Mr. Mueller's diminished lung capacity, along with his age and hypertension, make him especially vulnerable to the effects of COVID-19 should he become infected.  "People with . . . high blood pressure . . . are more likely to experience dangerous symptoms if infected with COVID-19."[4]  A recent study found that almost 30% of patients hospitalized with COVID-19 in Wuhan had hypertension, and that patients with hypertension had a twofold increase in the relative risk of mortality.[5]

These statistics become even more concerning when considered in the prison context.  Prisons are tinderboxes for infectious disease.  The question whether the government can protect

---

[4] *COVID-19: Who's at higher risk?*, Mayo Clinic (accessed July 1, 2020), https://www.mayoclinic.org/diseases-conditions/coronavirus/in-depth/coronavirus-who-is-at-risk/art-20483301.  Because hypertension is also called high blood pressure, the terms will be used interchangeably.  *See About High Blood Pressure*, Centers for Disease Control and Prevention (accessed July 1, 2020), https://www.cdc.gov/bloodpressure/about.htm.

[5] *See* Chao Gao et al., *Association of hypertension and antihypertensive treatment with COVID-19 mortality: a retrospective observational study*, 41 European Heart J. 2058 (June 2020), https://doi.org/10.1093/eurheartj/ehaa433; *see also* Shikha Garg et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1-30, 2020*, 69 Morbidity & Mortality Weekly Report 485 (Apr. 17, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm (finding that almost half of patients hospitalized with COVID-19 in the US had hypertension).

inmates from COVID-19 is being reexamined every day as outbreaks continue to emerge and new testing efforts reveal that the rate of infection in many correctional facilities is far higher than previously imagined.[6]  After reviewing the law and evaluating all the submissions and evidence that have been presented, I conclude that Mr. Mueller must be granted "compassionate release."

## I.    DISCUSSION

18 U.S.C. § 3852(c)(1)(A) allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction.[7]  Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term.  The policy statement lists three specific examples of "extraordinary and compelling reasons," as well as a "catchall" provision if the Director of the Bureau of Prisons ("BOP") determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described."  U.S.S.G. § 1B1.13, cmt. n.1(A)-(D).  In addition, the policy statement provides that a sentence reduction

---

[6] *See, e.g.*, *A State-by-State Look at Coronavirus in Prisons*, Marshall Project (June 25, 2020), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons; Jeremy Roebuck & Allison Steele, *Montgomery County's jail tested every inmate for COVID-19—and found 30 times more cases than previously known*, Philadelphia Inquirer (Apr. 28, 2020), https://www.inquirer.com/news/coronavirus-testing-montgomery-county-jail-asymptomatic-philadelphia-prisons-20200428.html; Kevin Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort*, USA Today (Apr. 25, 2020, updated Apr. 27, 2020), https://www.usatoday.com/story/news/politics/2020/04/25/coronavirus-testing-prisons-reveals-hidden-asymptomatic-infections/3003307001/.

[7] Mr. Mueller's motion is properly before the Court because he has complied with § 3582(c)(1)(A)'s 30-day lapse provision. *See* 18 U.S.C. § 3582(c)(1)(A) (providing that a prisoner can file a motion with the court upon the "lapse of 30 days from the receipt of [a request for compassionate release] by the warden of the defendant's facility").  He submitted a petition for compassionate release to the warden of FCI Allenwood on April 13, 2020, and was denied on April 16, 2020.

may only be granted if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(2). Furthermore, the policy statement mirrors the language of § 3582(c)(1)(A) and requires a court to consider the applicable § 3553(a) factors.

Although § 3582(c)(1)(A) requires a reduction in sentence to be "consistent with applicable policy statements issued by the Sentencing Commission," this Court recently concluded, in light of the amendment to § 3582(c)(1)(A) by the First Step Act of 2018, and the Sentencing Commission's failure to "update[] its policy statement to account for the changes imposed by the First Step Act," that "the policy statement is now clearly outdated." *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1, 2020). Accordingly, while "the policy statement may provide 'helpful guidance' [it] does not limit the Court's independent assessment of whether 'extraordinary and compelling reasons' exist under § 3582(c)(1)(A)(i)."[8] *Id.* at *4. I consider (1) whether "extraordinary and compelling reasons" exist to reduce Mr. Mueller's sentence based on the enumerated criteria in the policy statement and an independent assessment; (2) whether Mr. Mueller is a danger to the community under § 3142(g); and (3) whether the § 3553(a) factors support a sentence reduction.

### A.  Extraordinary and Compelling Reasons Exist

Mr. Mueller's circumstances—particularly the outbreak of COVID-19 and his underlying medical conditions that place him at a high risk should he contract the disease—present "extraordinary and compelling reasons" to reduce his sentence. Black's Law Dictionary defines

---

[8] For an in-depth discussion of the interplay between the amendment to § 3582(c)(1)(a) and the policy statement, which explains this Court's reasoning here, see *Rodriguez*, 2020 WL 1627331, at *2-6. *See also, e.g.*, *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019); *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. June 28, 2019).

"extraordinary" as "[b]eyond what is usual, customary, regular, or common." *Extraordinary*,
Black's Law Dictionary (11th ed. 2019).  It defines "compelling need" as a "need so great that
irreparable harm or injustice would result if it is not met." *Compelling Need*, Black's Law
Dictionary (11th ed. 2019).

Mr. Mueller's age and health conditions render him especially vulnerable to COVID-19,
and prison is a particularly dangerous place for him at this moment.[9]  In addition, he has served
almost all of his sentence and has demonstrated rehabilitation in prison.  None of these reasons
*alone* is extraordinary and compelling. Taken together, however, they constitute reasons for
reducing his sentence "[b]eyond what is usual, customary, regular, or common," and reasons "so
great that irreparable harm or injustice would result if [the relief] is not [granted]."
*Extraordinary*, Black's Law Dictionary (11th ed. 2019); *Compelling Need*, Black's Law
Dictionary (11th ed. 2019).

Mr. Mueller's lung removal and hypertension both place him at high risk of grave illness
or death if he gets infected with coronavirus.  COVID-19 attacks the lungs and can cause a host
of respiratory conditions: shortness of breath[10] and hypoxia (oxygen deficiency),[11] as well as
pneumonia, acute respiratory distress syndrome, and permanent lung damage.[12]  Mr. Mueller
lives with only one intact lung and has a long history of smoking.  Not surprisingly, lung

---

[9] To protect Mr. Mueller's privacy, the government submitted Mr. Mueller's medical records to the Court
under seal.

[10] *Symptoms of Coronavirus*, Centers for Disease Control and Prevention (accessed June 28, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

[11] Kianoush B. Kashani, *Hypoxia in COVID-19: Sign of Severity or Cause for Poor Outcomes*, 95 Mayo
Clinic Proceedings 1094 (2020), doi:10.1016/j.mayocp.2020.04.021.

[12] *What Coronavirus Does to the Lungs*, Johns Hopkins Medicine (accessed June 28, 2020),
https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-
the-lungs.

removal surgery leads to permanent loss of lung function.[13]  This means that Mr. Mueller has less of a protective buffer of lung function should he be infected.  Diminished lung capacity from COVID-19 could be even graver for him than for someone with normal lung function.  Recent research also found that in people with COVID-19, "the risk of disease progression in those who currently smoke or previously smoked was nearly double that of non-smokers" and "when the disease worsens, current or former smokers had more acute or critical conditions or death."[14]  His PSR also notes that he sometimes experiences shortness of breath.  PSR ¶ 89.  Further, as described above, hypertension has been identified as a "specific comorbidit[y] associated with increased risk of infection and worse outcomes."[15]  A recent study of 5,700 patients with COVID-19 in the New York City area reveals that the most common comorbidity was hypertension (56.6%).[16]  In New York State, 89.9% of the 24,904 total fatalities caused by

---

[13] *See, e.g.*, Luca Luzzi et al., *Long-term respiratory functional results after pneumonectomy*, 34 Eur. J. Cardio-Thoracic Surgery 164, 164 (2008), doi:10.1016/j.ejcts.2008.03.064; C.T. Bolliger et al., *Pulmonary function and exercise capacity after lung resection*, 9 Eur. Respiratory J. 415 (1996), doi: 10.1183/09031936.96.09030415.

[14] Elizabeth Fernandez, *Smoking Nearly Doubles the Rate of COVID-19 Progression*, University of California San Francisco (accessed July 1, 2020), https://www.ucsf.edu/news/2020/05/417411/smoking-nearly-doubles-rate-covid-19-progression (citing Roengrudee Patanavanich & Stanton A. Glantz, *Smoking Is Associated With COVID-19 Progression: A Meta-analysis*, Nicotine & Tobacco Research (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7239135/).

[15] Ernesto L. Schiffrin et al., *Hypertension and COVID-19*, 33 American Journal of Hypertension 373, 373 (May 2020), https://academic.oup.com/ajh/article/33/5/373/5816609.  Two studies from Wuhan, China revealed: "The most common comorbidities in one report were hypertension (30%), diabetes (19%), and coronary heart disease (8%).  Another report showed that the most frequent comorbidities in patients with COVID-19 who developed the acute respiratory distress syndrome were hypertension (27%), diabetes (19%), and cardiovascular disease (6%)."  *Id.* (footnote omitted).

[16] Safiya Richardson et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA (Apr. 22, 2020), https://jamanetwork.com/journals/jama/fullarticle/2765184.

COVID-19 had at least one comorbidity and the top comorbidity was hypertension (13,274 fatalities).[17]

In addition to having two underlying health conditions that place him at increased risk of severe negative outcomes from COVID-19, Mr. Mueller's age is a risk factor.  Mr. Mueller is 64 years old.  A study based on data "from individuals who tested positive for COVID-19 in 38 countries . . . found that risk of death from the disease rose with each decade of age."[18]  The death rate for people in their sixties who had COVID-19 was nearly 2%, more than three times higher than the rate for people in their fifties.[19]  The CDC has also consistently found over the course of the pandemic that death counts rise with each decade of age.[20]

In the absence of a deadly pandemic that is deadlier to those with Mr. Mueller's underlying conditions, these conditions might not constitute "extraordinary and compelling reasons."  It is the confluence of COVID-19 and Mr. Mueller's health conditions that makes this circumstance extraordinary and compelling.

Given Mr. Mueller's vulnerability to COVID-19, prison is a particularly dangerous place for him.  Although the government represents that FCI Allenwood has no cases of COVID-19, it never says whether anyone has been tested.  As of July 6, less than 17% of approximately

---

[17] *COVID-19 Tracker*, New York State Department of Health (accessed July 6, 2020), https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no&%3Atabs=n.

[18] Erin Schumaker, *Risk for severe COVID-19 increases with each decade of age*, abcNEWS (Apr. 1, 2020), https://abcnews.go.com/Health/risk-severe-covid-19-increases-decade-age/story?id=69914642 (citing Robert Verity et al., *Estimates of the severity of coronavirus disease 2019: a model-based analysis*, Lancet Infectious Diseases (Mar. 30, 2020), https://doi.org/10.1016/S1473-3099(20)30243-7).

[19] *Id.*

[20] *See Weekly Updates by Select Demographic and Geographic Characteristics: Provisional Death Counts for Coronavirus Disease 2019 (COVID-19)*, Centers for Disease Control & Prevention, Age & Sex, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#AgeAndSex (accessed July 5, 2020).

150,000 federal inmates in this country had completed testing.[21]  Of those tested, about 30% had COVID-19.[22]  Correctional facilities that have made the decision to undertake mass testing have discovered dramatically higher numbers of infected inmates than previously imagined.[23]  For instance, when Montgomery County, Pennsylvania tested every inmate in custody, it discovered "a rate of infection more than 30 times greater than what Montgomery County had identified before it began its mass testing."[24]  Similarly, when a prison in North Carolina tested all of its inmates, it discovered that it had not 39 cases—as it had previously thought—but 444 cases.[25]  In both facilities, this spike was in large part due to the number of infected inmates who have been asymptomatic.[26]

Despite the BOP's lack of testing, several virus hotspots have emerged and the BOP's reported cases of COVID-19 are growing.  For instance, at FCI Elkton, 946 out of 2,240 inmates have tested positive and 46 inmates have died.[27]  The BOP now reports that 1,932 inmates and 177 BOP staff "have confirmed positive cases" and 5,137 inmates and 584 staff have recovered, while 94 inmates and one staff have died.[28]  Because the BOP has tested so few inmates,

---

[21] *COVID-19 Cases*, Federal Bureau of Prisons (accessed July 6, 2020), https://www.bop.gov/coronavirus/index.jsp

[22] *Id.*

[23] *See supra* note 6.

[24] *See* Roebuck & Steele, *Montgomery County's jail tested every inmate for COVID-19—and found 30 times more cases than previously known, supra* note 6.

[25] *See* Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort, supra* note 6.

[26] *See id.*; Roebuck & Steele, *Montgomery County's jail tested every inmate for COVID-19—and found 30 times more cases than previously known*, *supra* note 6.

[27] *COVID-19 Cases*, *supra* note 21 (accessed July 6, 2020), https://www.bop.gov/coronavirus/index.jsp; *FCI Elkton*, Federal Bureau of Prisons (accessed July 6, 2020), https://www.bop.gov/locations/institutions/elk/.

[28] *COVID-19 Cases*, *supra* note 21 (accessed July 6, 2020).

however, these statistics almost certainly underestimate the true number of infections and the number of affected BOP facilities.  According to Leonard Rubenstein, a professor at Johns Hopkins Bloomberg School of Public Health, "Unless you do universal testing in all environments, the risk of spread is enormous.  If you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on. . . . It's too late."[29]

Without mass testing—and any detailed information about the current conditions at the FCI Allenwood—the Court may be getting a false picture.  If the Court waits to act until the BOP confirms its first case of COVID-19 at Allenwood, it may be too late for vulnerable inmates like Mr. Mueller.  The Court should not take that risk.

Prisons are ill-equipped to prevent the spread of COVID-19.  Many of the recommended measures to prevent infection are impossible or unfeasible in prison.  Public health experts recommend containing the virus through measures such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer.[30]  Joseph J. Amon, an infectious disease epidemiologist and Director of Global Health and Clinical Professor in the department of Community Health and Prevention at the Drexel Dornsife School of Public Health, has studied infectious diseases in detention settings and states:

> Detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care. People live in close quarters and are also subject to security measures which prohibit successful "social distancing" that is needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with

---

[29] *See* Johnson, *Mass virus testing in state prisons reveals hidden asymptomatic infections; feds join effort*, *supra* note 6.

[30] *See, e.g.*, *How to Protect Yourself & Others*, Centers for Disease Control & Prevention (accessed June 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html; Dr. Asaf Bitton, *Social distancing in the coronavirus pandemic — maintaining public health by staying apart*, Boston Globe (Mar. 14, 2020), https://www.bostonglobe.com/2020/03/14/opinion/social-distancing-coronavirus-pandemic-maintaining-public-health-by-staying-apart/.

little opportunity for surface disinfection. The crowded conditions, in both sleeping
areas and social areas, and the shared objects (bathrooms, sinks, etc.) will facilitate
transmission.[31]

The government does not dispute Mr. Mueller's counsel's representations that there are more

than 170 inmates on Mr. Mueller's unit, with whom he shares just two bathrooms; that he shares

a cubicle with two other inmates; and that hand sanitizer must be purchased with commissary

funds.  The BOP cannot adequately protect Mr. Mueller from infection.

Mr. Mueller is also close to his release date and has demonstrated rehabilitation.  He has

served the vast majority of his sentence, over twelve years.  He is two years away from his

release date, assuming continued good behavior.  Keeping him in prison for two more years

makes a marginal difference to his punishment, but a potentially profound difference to his

health.  That is why being close to his release date adds to the extraordinary and compelling

reasons to reduce his punishment.  He has also shown rehabilitation in prison. He has

participated in over a dozen programs while incarcerated, including drug treatment, conflict

management, work readiness, and parenting classes.  The only infractions in his twelve years of

incarceration concern an incident in April 2019 when Mr. Mueller was sanctioned for possessing

a hazardous tool and exchanging money for contraband.  These infractions were non-violent.

Mr. Mueller's physical vulnerabilities in light of this pandemic—chiefly that fact that he

has one lung—along with the amount of time he has served, his proximity to his release date, and

his rehabilitation, constitute reasons for reducing his sentence "[b]eyond what is usual,

customary, regular, or common," and reasons "so great that irreparable harm or injustice would

result if [the relief] is not [granted]." *Extraordinary*, Black's Law Dictionary (11th ed. 2019);

---

[31] *Declaration of Joseph J. Amon, Ph.D. MSPH* ¶ 20, Def. Reply Br. Ex. A, *United States v. Rodriguez*,
No. 2:03-cr-00271-AB-1, 2020 WL 1627331 (E.D. Pa. Apr. 1, 2020), ECF No. 134-1, also available at
https://www.aclupa.org/sites/default/files/field_documents/dr._amon_declaration_march_30_2020.pdf.

*Compelling Need*, Black's Law Dictionary (11th ed. 2019).  Mr. Mueller has presented

"extraordinary and compelling reasons" to reduce his sentence.

### B.  Mr. Mueller is Not a Danger to Others or the Community

The Commission's policy statement, which provides helpful guidance, provides for

granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other

person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13(2).

Mr. Mueller is not a danger to the safety of others or to the community under the factors

listed in in 18 U.S.C. § 3142(g).  Section 3142(g) sets out the factors courts must consider in

deciding whether to release a defendant pending trial.  These factors weigh both the defendant's

possible danger to the community and the defendant's likelihood to appear at trial.  Only the

former is relevant here.  The factors that weigh danger to the community include "the nature and

circumstances of the offense charged," "the history and characteristics of the person," including

"the person's character, physical and mental condition, family ties, . . . community ties, past

conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and

seriousness of the danger to any person or the community that would be posed by the person's

release." 18 U.S.C. § 3142(g).

The offenses for which Mr. Mueller is incarcerated are non-violent and do not suggest

that he is a danger to the community.  While he was convicted of possession of a firearm by a

felon, he was not using the firearm at the time of his arrest or in furtherance of another crime.

*See* PSR ¶¶ 11, 20.  He pleaded guilty to possessing 0.25 grams of heroin, which his PSR notes

was an amount "for personal use only."  PSR ¶ 20.  He was driving under the influence of drugs,

which posed a danger to the community.  PSR ¶¶ 9-12.  That was fourteen years ago, however,

and Mr. Mueller has undergone drug treatment since then.

Mr. Mueller has a lengthy criminal history.  While this history is serious, I find that Mr. Mueller does not pose a danger to others.  The crimes the government cites in its argument that Mr. Mueller is dangerous, aggravated assault and burglary, are nearly forty years in the past.  According to his PSR, Mr. Mueller has not been convicted of a crime considered "violent" under the Armed Career Criminal Act since 1981, when he was 24 years old.  *See* PSR ¶ 34.  (That crime was burglary.)  Further, his last conviction for drug dealing was in 2001, almost twenty years ago.  He is now 64, a factor that greatly reduces his risk of recidivism and hence any concerns that he could be a danger to the community.[32]  The government has presented nothing in his prison record that raises concerns about violence or drug dealing.

Mr. Mueller will not be a danger to the community during this pandemic because he has a home to return to, where he can self-quarantine, and an adequate reentry plan, as verified by the Probation Office.

**C.  The Section 3553(a) Factors Support a Sentence Reduction**

Finally, the Court must "consider[] the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A).  Section 3553(a) "contains an overarching provision instructing district courts to '*impose a sentence sufficient, but not greater than necessary,*' to accomplish the goals of sentencing."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (emphasis added) (quoting 18 U.S.C. § 3553(a)).  These goals include:

> the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and
>     to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and

---

[32] *Report-At-A-Glance: Recidivism & Federal Sentencing Policy*, United States Sentencing Commission (Mar. 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-recidivism-overview.pdf (noting that "[s]tudies have repeatedly shown older offenders to have a lower risk of reoffending and the Commission's study confirmed this finding").

> (D) to provide the defendant with needed educational or vocational training,
> medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  The other applicable sentencing factors the Court must consider are "the

nature and circumstances of the offense and the history and characteristics of the defendant" and

"the need to avoid unwarranted sentence disparities among defendants with similar records who

have been found guilty of similar conduct."  *Id.* § 3553(a)(1), (6).

I find that reducing Mr. Mueller's sentence to time served accomplishes the purposes of

sentencing.  The court should "impose a sentence sufficient, but not greater than necessary, to

comply with [these] purposes."  *Id.* § 3553(a).  Mr. Mueller has served over twelve years, most

of the original sentence imposed.  Twelve years is a long time—long enough to reflect the

seriousness of the offense, promote respect for the law, provide just punishment for the offense,

afford adequate deterrence to criminal conduct, and protect the public from further crimes of Mr.

Mueller.  As recognized by the National Institute of Justice, "[i]ncreasing the severity of

punishment does little to deter crime."[33]  Continuing to incarcerate Mr. Mueller will do little to

protect the public from his further crimes because, as already discussed, Mr. Mueller's age

makes him much less likely to recidivate.[34]  *See id.* § 3553(a)(2)(C).  Rather than being long

enough to provide Mr. Mueller with needed medical care, further imprisonment may interfere

with his ability to get needed medical care.  To prolong his incarceration further would be to

impose a sentence "greater than necessary" to comply with the statutory purposes of punishment.

"[T]he nature and circumstances of the offense and the history and characteristics of the

defendant," *id.* § 3553(a)(1), as discussed in more detail in the previous section, also support a

---

[33] *National Institute of Justice: Five Things about Deterrence* 1, U.S. Department of Justice, Office of Justice Programs, National Institute of Justice (May 2016), https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

[34] *See Report-At-A-Glance: Recidivism & Federal Sentencing Policy, supra* note 32.

sentence reduction.  To reiterate, however, Mr. Mueller has served over twelve years for non-violent offenses.  His release date is in two years.  And he is a 64-year-old with serious health conditions, including having only one lung and hypertension, a leading comorbidity associated with increased risk from COVID-19.

Finally, the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  *Id.* § 3553(a)(6).  Because Mr. Mueller has served the vast majority of his sentence and is two years away from release, granting his motion sufficiently minimizes sentence disparities between him and similarly situated defendants.

The applicable § 3553(a) factors support a sentence reduction for Mr. Mueller.

## II.      CONCLUSION

Mr. Mueller's sentence was never intended to include a grave risk of severe illness or death from an unforeseen pandemic.  For this reason, and the others elaborated here, I will grant Mr. Mueller's motion for a sentence reduction.  I will sentence him to time served and five years of supervised release with the conditions that he be placed on home confinement for six months, until January 8, 2021.  Mr. Mueller will also be ordered to self-quarantine in his home for 14 days.

S/Anita B. Brody
ANITA B. BRODY, J.

XC: U.S. Marshals, U.S. Probation, U.S. Pretrial Services,

Warden-F.C.I. Allenwood, Financial Litigation Unit

Copies **VIA ECF** on